# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR417-052 |
| | ) | |
| CHARLES ROBINSON | ) | |

# **REPORT AND RECOMMENDATION**

Defendant Charles Robinson moves to suppress statements he made to law enforcement officers during the execution of a search warrant at his residence. Robinson alleges that his statements are inadmissible both because the officers failed to administer warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and because they were involuntary. On June 14, 2017, the Court held a hearing on Robinson's motion. *See Jackson v. Denno*, 378 U.S. 368 (1964); *see also* 18 U.S.C. § 3501. After considering the testimony at that hearing and resolving the factual discrepancies in the witnesses' testimony,[1] the Court finds no basis for the suppression of Robinson's statements.

---

[1] The two witnesses at the suppression hearing, Task Force Officer John Schmitt and Defendant Robinson, gave conflicting testimony as to certain aspects of Robinson's interrogation. The Court found TFO Schmitt to be a far more credible witness, and the following facts are drawn primarily from his version of events. Robinson's contrary account is set forth at the conclusion of the fact section.

I.   **FACTS**

On February 21, 2017, this Court issued a search warrant for a residence located in Yamacraw Village, a public housing complex in downtown Savannah, Georgia, after finding probable cause to believe that someone was receiving child pornography via an Internet account registered to that address. *In the matter of the search of 814 Yamacraw Village, Savannah, Georgia*, MJ417-015, doc. 3-1 (affidavit in support of search warrant application) (attached as an exhibit to defendant's motion to suppress, doc. 21-1).  Because the residence was located in a high-crime area of the city, where there had been recent shootings, Suppression Hearing Transcript ("Tr.") at 11, 17, 18, an "entry team" equipped with ballistic vests, shields, and semi-automatic rifles was called upon to secure the residence before the search began. *Id.* at 17-19. The entry team encountered no resistance from the female lessee of the residence (A. W.), who had just returned to the dwelling after placing her child on a school bus.

As they swept through the residence, one of the four to five members of the entry team encountered defendant Robinson near an upstairs bedroom and ordered him to show his hands and go downstairs.

Once downstairs, Robinson was subjected to a brief pat-down to confirm that he was unarmed. He was then directed either to remain in the den (*id*. at 11) or step outside briefly (*id*. at 23) (the record is unclear). Within five minutes or so, the entry team secured the residence and departed, leaving members of the FBI/Southeast Georgia Child Exploitation Task Force to conduct their search of the residence. *Id*. at 9, 11-12, 18.

Shortly thereafter, *id*. at 38, Task Force Officer (TFO) John Schmitt and FBI Special Agent William Kirkconnell approached Robinson and told him to step into the kitchen, located at the back of the residence, where they could talk. *Id*. at 12, 39-40. Robinson sat in a chair at the kitchen table next to the unsecured screen door (as the rear door to the residence had been left open). *Id*. at 12-13. Agent Kirkconnell explained that the agents were executing a federal search warrant, that Robinson was not required to be present during the execution of that warrant, and that he was free to leave the residence. *Id*. at 13. TFO Schmitt then pointed out that Robinson had unobstructed access to the open back door of the apartment and that he could simply walk out if he so desired. *Id*. at 13, 40. At no point did the

agents block Robinson's access to the back door. *Id.* at 15, 27. Nor did they touch him or lean over him in some intimidating fashion. *Id.* at 33 ("We kept our distance. It was normal casual conversation distance."), 39.

The agents spoke with Robinson in the kitchen for some 15 to 30 minutes. *Id.* at 29. They conducted their interview in "normal conversational tones," *id.* at 15, and never yelled at or threatened him. *Id.* at 15, 24. Robinson was cooperative and did not appear to be unduly stressed during the interview. *Id.* at 23, 37.

After informing Robinson that someone at the residence had been downloading child pornography, the agents asked if he was the person responsible. *Id.* at 30. Robinson freely admitted that he was. *Id.* Robinson then explained that he had become interested in child pornography after discovering it on a laptop that he had stolen while working as a baggage handler at the airport. *Id* at 31. When the agents asked for passwords to the various electronic devices seized during the search, he readily provided them. *Id.* 24-26, 32.

At the conclusion of the interview the agents informed Robinson that A. W., the female lessee of the residence, wanted him to vacate the

premises. The agents allowed Robinson to collect his personal belongings, and he then departed in his own vehicle.

Robinson's version of the events varies in some important particulars, although it was consistent in others. Robinson conceded that some of TFO Schmitt's testimony was accurate, *id.* at 48, and he admitted that he was never handcuffed, ordered to get on the floor, or yanked about by the agents, *id.* at 51. He further conceded that the interview occurred while he was seated at the kitchen table next to a screen door that served as an exit-way from the residence. *Id.* 52, 54. He also acknowledged that he never asked to leave, requested water or bathroom breaks, or stood up and tried to leave. *Id.* at 53. But, Robinson stated that: (1) the interviewing officers never told him that he was free to leave or that he did not have to talk, *id.* at 44, 48; (2) one of the officers (Kirkconnell) "yelled" at him several times, *id.* at 43, (3) he was "shivering" from fear and told the officers he was afraid, *id.* at 44; (4) "someone" stood between him and the screen door, blocking his exit path, *id.* at 49 (5) one of the officers (apparently Kirkconnell) twice placed his hand on Robinson's shoulder during the interview,[2] *id.* at 44,

---

[2] Robinson testified that the agent put his hand on his shoulder twice. On cross

5

46; and (6) when he initially disclaimed knowledge of any child pornography, the officers claimed to know otherwise and asserted that "the severity" of his treatment depended upon the nature of his cooperation, *id.* at 46-47.

The Court finds this testimony to be unworthy of belief and instead credits TFO Schmitt's contrary testimony that the agents carefully explained that Robinson had every right to leave the premises during the execution of the search warrant, pointed out the unsecured screen door that was within his arm's reach, and never blocked his access to that door in any manner. The Court further rejects Robinson's assertion that either agent ever "yelled" or raised his voice during the interview, or threatened him with more severe treatment if he refused to cooperate. Finally, the Court does not credit Robinson's claim that he was visibly shaking or overwrought at any time during the interview, or that he expressed any feelings of fear to the agents. TFO Schmitt's testimony

---

examination, however, the prosecutor asked Robinson about his interpretation of that shoulder touch. She asked whether Robinson thought he was "trying to comfort you, make you feel comfortable." Robinson responded that he was "not sure." Thus, even assuming that Robinson accurately remembered the interview and (despite Schmitt's contrary testimony) the agent did put his hand on Robinson's shoulder, it is *not* clear that such contact could be construed as intimidating in any way. Robinson himself is equivocal about the significance of contact that does not appear to be more than incidental -- even if it happened at all.

was simply more convincing than that offered up by Robinson.

## II. ANALYSIS

Robinson wants his statements suppressed because, he contends, they were made while he was in custody and the Government did not comply with the "warning and waiver requirements" of *Miranda v. Arizona*, 384 U.S. 436 (1966). *See* doc. 21 at 1, 2-3. He also alleges "that [his] statements . . . were involuntary." *Id.* at 2. The Government insists that he "was not in custody during his interview, so *Miranda* warnings were not required . . . ." Doc. 26 at 2. At the conclusion of the hearing, however, Robinson's counsel conceded that the voluntariness of his client's statements was "the more pressing issue."

To suppress his statements based on the lack of a *Miranda* warning, Robinson bears the burden of demonstrating that he was in custody when he made them. *See United States v. Peck*, 17 F. Supp. 3d 1345, 1353-55 (N.D. Ga. 2014) (citing *United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977)); *see also United States v. Palmer*, 2017 WL 2423059 at * 3 (S.D. Ga. June 5, 2017). And "custody" in the *Miranda* context "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565

U.S. 499, 508-09 (2012) (quotes and cites omitted).

Whether a suspect is "in custody," depends upon "whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotes and cite omitted). Despite the sensitivity of the test to the circumstances of the interrogation, it remains an objective inquiry. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (evaluation of custody is context-sensitive, but objective); *see also United States v. Eubank*, 2015 WL 3557493 at * 6 (S.D. Ga. Mar. 18, 2015). The circumstances of the interrogation are evaluated from the perspective of "the reasonable innocent person." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006); *Eubank*, 2015 WL 3557493 at * 6 ("The test [for custody] is an objective one: taking into account all the circumstances surrounding the interrogation, would a reasonable person -- one innocent of any wrongdoing -- have felt that he was not free to terminate the interview and leave." (cites omitted)).

Robinson's interrogation was not custodial. First, it took place in his home -- or at least a place where he regularly resided. *Brown*, 441 F.3d at 1348 (although the location of an interview is not dispositive,

"courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.") (quotes and cite omitted)).  Second, the officers informed him he was not under arrest and was free to leave.[3]  *See id.* at 1347 ("[T]he fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable person would have felt free to leave.").  Even based on Robinson's version of events there was no restraint on his freedom tantamount to *"Miranda* custody."  He has not, therefore, shown that he was "in custody" when he made the challenged statements; so *Miranda* and its progeny provide no basis for suppressing them.

Even absent custody, Robinson's challenged statements may still be inadmissible if they were involuntary.  *See, e.g., United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) ("Even if [the defendant] was not in custody in the technical sense (and thus *Miranda* warnings were not required), we would still be required to address the voluntariness of his

---

[3]  Robinson does not contend that he was expressly told he was *not* free to leave, and he conceded that he never asked to leave.  The critical discrepancy between Robinson's and Schmitt's version of events is whether Robinson was expressly told that he was free to leave. Schmitt's specific recollection -- that he pointed to the open door and told Robinson he was free to walk out -- is compelling.  Robinson's more general assertion that he was never told he was free to leave is simply less credible.

confession."). A confession is involuntary, and thus inadmissible, "only when the [totality of] the circumstances show that 'coercive police activity' overcame the defendant's free will." *Arvelo v. Sec'y Fla. Dept. of Corrs.*, ___ F. App'x ___, 2017 WL 1947909 at * 2 (11th Cir. May 10, 2017) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).[4]  "Some

---

[4] The constitutional protection against self-incrimination includes *Miranda* warnings that a suspect's statements may be used against him, and the more general Due Process requirement that there must be a "voluntary, knowing, and intelligent waiver" of a suspect's rights before "uncounseled incriminating statements made during a custodial interrogation may be admitted." *Lall*, 607 F.3d at 1282-83 (citing *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991)). Custodial interrogation presents a sufficient specter of coercion that failure to comply with *Miranda*'s requirements creates a presumption that a confession was not voluntary. *Id.* at 1285 (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991); *Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984)). And if the Government contends that a suspect waived his *Miranda* rights, it must show that the waiver was "voluntary, knowing and intelligent" by establishing: (1) that "'the relinquishment of the right [was] voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception[;]'" and (2) it "'must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 1283 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

As noted, Due Process requires that *non-custodial* statements be voluntary as well, but the context changes the degree of volition required. Non-custodial statements are "voluntary," and thus admissible, if they are "not extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight." *Lall*, 607 F.3d at 1285 (quoting *Bram v. United States*, 168 U.S. 532, 542 (1897)); *see also United States v. Stinson*, 659 F. App'x 534, 536-37 (11th Cir. 2016). In non-custodial situations, voluntariness is not the exception, but the rule. *See Beckwith v. United States*, 425 U.S. 341, (1976) ("[N]oncustodial interrogation *might possibly in some situations*, by virtue of some *special circumstances*, be characterized as one where the behavior of law enforcement officials was such as to overbear [a suspect's] will to resist and bring about confessions not freely determined." (emphasis added) (alterations, quotes, and cite omitted); *see also Eubank*, 2015 WL 3557493 at * 8 ("But while a defendant's individual characteristics may suggest that he was especially susceptible to police coercion, or even that he lacked the volitional ability

10

form of government coercion is essential to a finding of involuntariness." *United States v. Lynn*, 547 F. Supp. 2d 1307, 1310 (S.D. Ga. 2008) (citing *Connelly*, 479 U.S. at 163). As this Court has explained:

> In determining voluntariness, the Court must assess "the totality of the circumstances -- both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973). Coercive conduct normally involves an exhaustively long interrogation, the use of physical force, or the making of a promise to induce a confession. *Connelly,* 479 U.S. at 163 n. 1; *United States v. Mendoza-Cecelia,* 963 F.2d 1467, 1475 (11th Cir. 1992). Ultimately, the Court must determine "whether a statement was made freely or whether the defendant's 'will has been overborne and his capacity for self-determination has been critically impaired.'" *Devier v. Zant,* 3 F.3d 1445, 1455-56 (11th Cir.1993) (quoting *Culombe,* 367 U.S. at 602).

*Lynn*, 547 F. Supp. 2d at 1310.

The instant case is profitably compared to *United States v. Bhatt*, 160 F. Supp. 3d 1359 (N.D. Ga. 2016). There, the Court expressed its "strong concern that the search and interrogation methods used in this case barely fall within the borders of what is legally acceptable, particularly with respect to the voluntariness of the Defendant's statements." *Id*. at 1361. Law enforcement entered the defendant's

---

to make a free and rational choice, [his] confession is nevertheless voluntary *unless the police exploit that susceptibility* or mental weakness *with coercive tactics.*" (emphasis added; cite omitted)).

11

house violently, "implementing a 'shock and awe' strategy to obtain the maximum information feasible in connection with an investigatory search." *Id*. The defendant was handcuffed, along with other members of his family, for ten to fifteen minutes, kept in his boxers, and not given the opportunity to dress before or during the interview, which lasted for almost three hours, with only brief respite. *Id*. at 1361-2. Despite those facts, the Court nevertheless found that the Government had borne its burden to show the defendant's statements were voluntarily made. *Id*. at 1364-65. If those facts pushed the interview close to, but not over, the voluntariness line, then the facts in this case don't even approach it. *See also Eubank* 2015 WL 3557493 at * 8-9 (despite "aggressive conduct [including,] repeated accusations that [defendant] was being deceptive, shouted-out questions, the use of curse words, and dramatic displays of pique" the Government met it burden of establishing statements were voluntary).

Even assuming Robinson's testimony was entirely accurate, the only facts supporting his involuntariness claim are that the "entry team" was in tactical gear, he wasn't told that he was free to go, and his assertion of Kirkconnell's assurance that "We already know everything,"

and that the "severity" of his prosecution would "depend" on whether or not he cooperated.[5] The limited appearance of the armed entry team, agents' (alleged) failure to *expressly* tell Robinson that he was free to leave, and their vague references to law enforcement's superior knowledge and encouragement of cooperation, are simply not enough to make his statements involuntary. *See Bhatt*, 160 F. 3d at 1363 ("Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. [Cit.] Isolated incidents of police deception, [cit.], and discussions of realistic penalties for cooperative and non-cooperative defendants, [cit.], are normally insufficient to preclude free choice." (cites omitted)); *id.* at 1364 ("Eleventh Circuit law remains clear that the isolated representations of a law enforcement officer who encourages cooperation with the government and indicates the adverse consequences of non-cooperation will not alone be deemed an illegal inducement that overwhelms the defendant's ability to freely and voluntarily make a

---

[5] Schmitt's testimony, which the Court credits, contradicted those assertions.

statement."). The remaining facts, including Robinson's education,[6] the limited disruption caused by the entry team (Robinson mistook them for a TV program), the relatively short duration of the interview, and the lack of any suggestion of expressly coercive tactics, all weigh in favor of a voluntariness finding. The Court therefore finds that the Government has borne its burden to show that Robinson made the challenged statements to law enforcement voluntarily.

## III. CONCLUSION

Charles Robinson's motion to suppress his statements (doc. 21) should be **DENIED**. This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

---

[6] Robinson testified that he has "a computer degree," and the FBI report submitted with his motion reflects that he "is a 2011 college graduate from South University with a degree in computer technology." Doc. 21-1 at 70.

14

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED**, this  14th  day of July, 2017.

_/s/ G.R. Smith_
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA